The last case this morning is Enanta Pharmaceuticals v. Pfizer, 2025-14-27. Ms. Viecha, when you are ready, you may proceed. Good morning, Your Honors. May it please the Court, The District Court erred in granting summary judgment that Enanta's 9-5 free patent is not entitled to claim priority to its provisional application. Below, Pfizer seized on the fact that Enanta made a change to its provisional to address a typographical error, and then it convinced the District Court to rely on the wrong line of cases. The decision at 8-20 makes clear that the District Court, relying on Novo Industries, asked the wrong question. Putting aside language in different cases, but when one looks at the provisional, it's done with great care. All sorts of substituents are laid out there. Probably none of them have been reduced to practice, and anyone who did that drafting is expecting that these do constitute very careful, constructive reduction to practices. Then why don't we give the same kind of respect and credence to what was omitted? There's no indication that there was an error. Your Honor, there is an indication in the factual record that there is an error. One of the inventors testified as such that the typographical error had been identified 10 days before the filing of the non-provisional. And Enanta's expert witness, a medicinal chemist formerly headed at Merck, testified that the person of ordinary skill in the art reading the specification would have understood there to be an error. Moreover, Your Honor, Enanta's expert witness took on two questions. One, first, whether there was a typographical error. The expert witness is sort of subordinate. You say an inventor testified and said, I made a mistake? The inventor did not. The inventor said there was a typographical error identified in the specification 10 days before the filing of the non-provisional. There's no further evidence in the record about who made the actual error. Well, you have inventors, and you have a draft person of the application who could have said, I meant this, but I just made a mistake. That's not in the record. No, it's not, Your Honor. And the reason for limiting a claim is to often avoid prior art. And perhaps there was knowledge of what the Pfizer compound was, and this omission avoided the prior art, right? No, Your Honor. It did not avoid the prior art. A couple of things going on here. The Pfizer reference disclosure was not made until March of 2021. It involved a substituent that was a substituted C1 alkyl. And it was after that that Enanta made the change when it reviewed the application to prepare for the non-provisional filing. There's no evidence in the record other than the fact that, because the inventor was testifying as a 30B6 witness solely for the purpose of, was it a typographical error, and what was the date on which the error was identified? Those are the only facts that we have in the record. Well, when it was supposedly identified isn't the point. The point is the dates of the filing of the respective applications, and there was an intervening act, namely a disclosure of Pfizer's compound at a conference, right? Yes, Your Honor. It's not unusual for there to be intervening art between the filing of the provisional and the non-provisional. The question here is whether the provisional itself conveyed possession of the C1 substituted alkyls. The way one conveys possession is by disclosure. Well, the patents, the specification of the provisional does disclose in numerous places the identification of C1 alkyl substituents. The C1 to C12 range is listed as the sixth identified substituent in the definition of substituted. And the expert in this case, and Anta's expert in this case, looks and reads through that definition of substituted and identifies numerous instances where there are C1 alkyls identified. C1 alkyls, but the C1-C12 alkyl only shows up once, as I count them, in the substituted, and after that it's all C2 to C12, right? Eighteen times. That's correct, Your Honor. Okay. And the expert, our expert, explained that based on the positioning of alkenyl and alkynyl. Cut and paste. He believes it to be a cut and paste. He used the word likely, though. In fact, his declaration says the word likely in three different locations. And that gave me some pause because even if we were to go with a written description framework here, what you're really asking for is for a court to conclude that text that is not in the spec, i.e., C1, is necessarily in the spec in light of everything that it says. In other words, it does say C2 to C12. You need a court to displace the C2 and replace it with a C1, and it has to necessarily be so. And then when Dr. Young says likely, likely, likely, that's not quite the same to me, to my eye, as it's necessarily so. There's no other way to read this other than to conclude C2 must be understood as C1. And I didn't quite see him say that. I understand he said the conclusion, which is I believe there was an obvious typographical error here. But then when you walk through his factual reasoning for why that is so, he says likely three different times. And that made me a little concerned that perhaps now we are getting a little bit into the realm of speculation and not so much as a factual objective matter. It must be that the C2 can be C1. It cannot be anything else. Your Honor, respectfully, I don't think that necessarily is the appropriate standard here. The question is whether the- What if it's an inherency doctrine for written description? Then wouldn't it be necessarily what is not there, not actually stated, must necessarily be inherently contained in the specification? Your Honor, the specification, though, does identify numerous places where the C1 alkyl substituents are identified. And I want to direct the Court's attention to the definition of alkyl, which the district court just outright rejected. Could you get to the references to C1 in a few different places? Why couldn't that be understood quite reasonably that the patent drafter and inventor very well knew how to say C1? In fact, it said C1 lots of times in other types of substituents. So then the fact that it said C2 to C12, I don't know, 15, 18 times, maybe is a clear signal that the times it said C2 over and over again, it meant to say C2. Your Honor, I think you're raising a question of fact under the written description doctrine. The priority question and the written description test as a whole are questions of fact for a fact finder. We are here today at summary judgment, and all inferences should be, reasonable inferences should be drawn in favor of the non-movement, Enanta. And Enanta's expert testimony should be viewed in the light most favorable to it. That did not happen in this case, where the district court judge was applying a heightened standard of no vote, and it's highly unclear whether she even considered the questions from the perspective of the person of ordinary skill in the art, or whether she was looking at it as a judge interpreting a legal instrument without the lens of the person of ordinary skill. Let me see if I understand your basic theory of the case, which is that I take it that you believe, and I think this is what you just said, that the filter through which we should view this case is written description, because this is essentially a new matter case. So what we need to look at is, is there adequate written description of the ultimate claim in the non-provisional to be found in the provisional? I.e., does the provisional, and correct me if this is not your standard, have you met your burden of showing that the provisional reasonably conveys to the person of ordinary skill in the art that the inventor had possession at the time of the provisional? In a word, in a couple of sentences, that's your position, is it not? Correct, Your Honor, that is our position. And our burden is one of production. We've met that burden by providing the evidence of Dr. Young. Ultimately, the burden is on them to show, once you satisfy the court that you have a reasonably conveyed possession, that they need to show that nonetheless. No reasonable jury could agree with us. Right, because of the, and then that raises the next question, which is, is this a jury question? A lot of the cases that have been decided in the new matter area, of course, come from the board and et cetera, and the jury issue doesn't come up. I don't remember any cases in which this precise issue has come up as a jury question. Maybe there are some, but I haven't seen them. I don't believe you cited any in your brief. So there have certainly been cases where there are jury instructions, where the jury is required to identify whether the priority claim, in light of a change between the provisional and the non-provisional or a subsequent application, that question has gone to the jury. I believe one case that we have cited where there is a jury instruction is Cummins-Allison. That is the one that comes to mind. I can think of at least one other case that includes a jury instruction. So your position right now, I take it then, is we think we have shown at least a jury question as to whether the provisional would reasonably have conveyed to a person of skill in the art that you possessed the subject matter that was ultimately in the non-provisional. That's correct, Your Honor. C-1. C-1. The C-1 Alkyl substituents. Now, as to the question, the thing that is troubling me here is that it seems to me that it's – I may be wrong about this, but my take on this, tentatively at least, is that it's pretty clear there was an error here because, if nothing else, the reference to the C-1 – excuse me, to the C-2 to C-12 alkyl in the definition of alkyl is followed immediately by the 1 to 12, which is presumably saying, if thought, what appeared in the C-2 to C-12 numerals. So someone made a mistake at that point, it seems to me. It's hard to square that with the idea that this was all intentional. So that mistake was part of the non-provisional application. I know. That's what I'm saying. And that mistake was not corrected. Yeah, yeah. Yes. I understand. And I think that there's a reasonable inference to be drawn, and Dr. Young sort of relies on the definition of alkyl and the inconsistency there as a signal that the applicant intended to use C-1 to C-12.  But that raises – just finding that there was an error doesn't answer the question of which way. I mean, it could be that the error was in putting in the 12, or the first time that C-1 shows up, the error may have been it should have been C-2. How do we know which it is? Your Honor, we don't know at this point. And it is a question of written description. And that's why a jury should hear it. All right, all right. I apologize. Then the next question is, is it possible there's still a failure of proof here to get it to a jury? Because in this particular instance, if Dr. Young says, well, in circumstances like this, when a written-out number conflicts with a numeral, it's likely the typo is in the numeral and not the written-out number. And if the standard is a person of skill in the art reading this would necessarily need to conclude that the C-2 is really a C-1, then perhaps what Dr. Young stated here isn't enough to meet that standard. I believe, Your Honor, that Dr. Young was pretty emphatic about the error in alkyl and that the person of ordinary skill in the art would have read the definition of alkyl to refer to mean, ultimately, and rely on the 1 to 12 range. He said two things. He said the numeral is likely to contain a typographical error. And then he ultimately backs that up with noting that the alkyl groups are listed in ascending order. But then the district court seemed to make a good point that when you look at the alkynyl groups in their respective definitions, you don't have perfect descending order of the atoms in those examples. So I get your point, which is if this is a fact question, then maybe this needs to go to a jury. But even if there is not all evidence is good enough evidence to get something to a jury is kind of the point I'm trying to explore. I understand, Your Honor. I do want to make two points. I see my time, and I've used my rebuttal time here, is up. You can answer the question. We'll give you some rebuttal time. Thank you, Your Honor. Sorry, now I've lost my train of thought. So first, I wanted to repeat the summary judgment standard. The evidence has to be viewed in the light most favorable to Enanta as the non-moving party. And I want to underscore that Pfizer did not submit any expert testimony in response to this whatsoever. There is none. So the district court made her decision based on her reading of the specification and a pure attorney argument unsupported. And in that instance, I think it would be wrong to discredit or reject Dr. Young's testimony. His testimony is very reasoned. He has five to six pages of his expert report that explain the basis for his reasoning. He indicates that he does not believe the difference in substituted and the provisional and the non-provisional were inconsistent and that nothing broadened the scope of the disclosure of the provisional application. That's the evidence that should be read in the light most favorable to Enanta. Let's hear from Pfizer. Thank you. We'll give you three minutes for rebuttal. Thank you, Your Honor. Thank you, Your Honor. May it please the court. I'd like to begin with where Your Honor did with the question of public notice. We see this, notwithstanding all this discussion of genuine issues of material fact, as being a legal question. This court has routinely applied both in the prosecution context in Rayoda and in the district court context in the Novo Industries case, a high standard to deem a document to say something it didn't. And to elucidate the chronology that Your Honor alluded to, here we have a provisional application that discloses a long, long laundry list of different moieties that they considered to be their invention, putting the public on notice. This is what we possess. And one of those was the range NHCO C2 to C12 alkyl. Subsequently, Pfizer comes out with a compound which they contended in their infringement analysis in this case is an NHCO C1 alkyl. And subsequently to that, they filed a non-provisional application that broadened that range into NHCO C1 to C12. You know, that is a, you know, their principal argument below and their principal argument here is that this court should go back in time and sort of cross out the two and turn it into a one because it's an obvious error under this court's precedence for error correction. And we submit they can't possibly meet that standard. But suppose instead of there being 18 C2s and one C1 in the substitution definition, suppose it were there was only one place where there was a C2 that showed up. So there was a tiny bit of lack of certainty. You wouldn't argue there that you can't ignore that, that C2 is in there. I would for this reason. I think it's actually a misperception of this definition of substituted to count up the different C1s because they're all different moieties. There's a C1. I'm not counting the C1s that go with the same moieties other than C1 to C12. Just take the C1s to C12 and the C1, one C1 to C12 and then 18 C2 to C12. But I'm suggesting to you, I mean, you're taking a hard line on saying if it ain't there in hyc verba, it can't be read to mean something that it doesn't explicitly say. And I'm suggesting to you there may be circumstances, maybe not this case, I don't know, but there may be circumstances in which you can't tell for absolute certainty what it meant, but you can reasonably conclude that that was what was intended to be conveyed. And under the written description standard, that's the test, is it not? Reasonably convey. Am I right about that? So that is the general written description test. But let me answer your question with two points. First, this is not a garden variety written description case precisely because But isn't written description the standard that we apply in this setting to new matter? It is, but only where there's some argument about how the person of ordinary skill in the art would interpret what it actually says. Here, there's no argument that NHCO C1 alkyl is supported by NHCO C2 to C12 alkyl. The argument is that the C2 must be wrong. And that's why I think, Your Honor, you need to apply the error correction cases. But the second point, and I think this is an important one in reading all of this, is that there aren't multiple C1 to C12 alkyls that should be considered as a group and totted up the way Your Honor presupposed. There is one and only one disclosure of the range NHCO C2 to C12 alkyl. That's a different moiety with different atoms and different properties from NHCO excuse me, from NH C1 to C12 and from C1 to C12. And what are we talking about, appendix 127? We're talking about the definition of substituted. I believe it is appendix 127. Line 25. Sorry, Your Honor? Line 25. Exactly right, Your Honor. The point is that each of these has different properties. And when you, if the court treats this as a summary judgment question, and if the court, sorry, Your Honor, if the court were to treat this as a question of whether there's a genuine issue of material fact, there's no material dispute. There's no genuine dispute about whether NHCO C1 is disclosed anywhere. There are other C1 moieties, but to Judge Lurie's point, with precision they identified particular ranges of particular compounds. We also have KALO C1 to C4 alkyl. We have these alkenyls and alkynyls that they point to, but there's C1 to C12 alkyl and NHCO C1 to C12 alkyl are just not the same substituent. The other point of confusion that I think I urge this court to avoid is between the definition of substituted and the definition of alkyl, which is where, you know, that's at appendix 124. That is a place where we agree that you could tell something's kind of wrong. You could tell that there is some kind of error there in that in this definition of how the C substituents work, it says C2 to C12 alkyl, and then that corresponds to 1 to 12 written as letters. Right. So that's pretty clear it's an error. That's pretty clear it's an error. Now, their expert conceded that you could fix it either way. You could turn the ONE to a TWO or you could change the numeral. But that never got fixed in the non-provisional. The change that they want to carry backwards in time from the non-provisional to the provisional is in the definition of substituted, where NHCO C2 to 12 alkyl got changed to NHCO C1 to 12 alkyl. The alkyl definition never got changed and also never affects the scope of the invention because it's not the relevant, it doesn't define the scope of this claim term substitute. No, but it tells us something about what went into making this problem, creating this problem. It tells us what the terminology means. I don't agree that the way it's used, the alkyl definition tells you which substituents they consider to be part of their invention, whereas the definition of substituted does. They are saying that when they use the term substituted in the claim as a part of the definition of the A group in Claim 1, that whatever moieties are included, the ones they list are ones that they considered and are in possession of. That's what that says. And they're retroactively trying to change that. They're retroactively trying to broaden it. Let's assume written description is the right framework to use here. What more would you need Dr. Young to have said to have created a genuine issue of fact here as to whether the provisional reasonably conveys to an artisan the idea that these various substituents where they say C2 to C12 alkyl really meant C1 to C12 alkyl? You would have needed something to connect the dots between C2 to C12 alkyls as a general class and the particular substituted alkyl. Well, what about the idea is there's a very clear definition of alkyl in this spec. And we know there's a mistake. And there's no, let's say Dr. Young says there's no earthly reason why that C2 was meant to be C2. It's clearly a typo. It should have been C1. And any time you see this alkyl reference throughout this spec, it should be understood in the context of my alkyl definition here and my alkyl definition now that it's established that it's C1 to C12 to resolve that conflict. That resolution is now shot through the entire spec. So I don't understand Dr. Young to be saying, and I don't think Dr. Young could be saying. I know that, but I'm trying to explore with you what you think is missing to create a genuine issue that should go to a trial. And what is missing is any— One way to look at what Dr. Young has said is that maybe what he has said is enough to create an open fact question as to whether a skilled artisan would think that the content of this written description reasonably conveys the idea of C1 to C2. And I think the answer is something in the right part of the specification, something in the definition of substituted that indicated that there was something amiss, that there was more than, in his view, a likely error, but that the person of ordinary skill in the art could not but read this definition of substituted. Well, was there testimony from the draft person or the inventor saying, I meant C1? There was testimony from the inventor that he meant C1 and added it to the non-provisional. And that was recognized after, by the way, the disclosure of Pfizer's compound. So it was not at the time of the provisional. Correct. He did not testify that the C1 was intended at the time of the provisional, is what you're saying? Sorry, no. His testimony was that the recognition of an error was after the disclosure. Later. Right, but the recognition of an error. Yes. Did he testify that at the time of the provisional, he intended C1? He did. I would not. I would submit that that is not, that also does not address any material fact because it's not a subjective inquiry. The answer to Judge Leary's question, I think, is that he did testify at the time, that at the time of the provisional, he intended C1 and C2 was put in by mistake. That's how I understand it. Does that raise a genuine issue of material fact for a jury? No, it does not because this is not a subjective inquiry. You don't get to say that you're just. But his credibility, isn't that an issue? I don't think it matters, even if it were clearly true that he intended to write C1 instead of C2, even if that were established, which it is not. But even if it were, that would not make it an obvious error under this Court's precedence, nor would it satisfy the written description standard, which is about what is disclosed to the POSA. I mean, I just don't think that his subjective intent is relevant under any of the governing legal standards anyone's advocated here. Well, it would be relevant if he testified that I intended C2. You wouldn't disagree with that proposition, I think. I would disagree in that this is an objective inquiry. Written description is about what the provisional application here discloses to the person of ordinary skill reading it. I don't think it serves that notice function. I don't think it's consistent with the way patent specifications embody a quid pro quo with patent claims to say that post hoc explanations of what you wish you had written should carry the day in terms of what you did right, to Judge Laurie's original point. And you also think that even if he had fully admitted that he intended C2 all the way along, that would be irrelevant. I agree. You're saying that. I don't think what the inventor says he meant matters. All right. I think the relevant legal standard is how the provisional would be read, and in particular here, whether the provisional makes it clear that there is an obvious error that has to be read to mean something other than what it says. You're saying it's not obvious. I'm saying it's not obvious. And it is not obvious, number one, because there's absolutely nothing in the intrinsic evidence to suggest that the ranges are wrong. Their own expert conceded that the quote unquote error is merely likely. He also conceded that the range that was in the original provisional has nothing chemically wrong with it. He testified, and this is at appendix 2220, that chemically you can have a C2 to C12 alkyl. It is not an error apparently to the reader of the specification through the eyes of a chemist, through the eyes of a medicinal chemist with the relevant skill set. And a further point that I think fatally undermines the notion that this could possibly be an obvious error all along is that Enanta itself, in advancing claim construction in this case, initially started out trying to construct the other way around. I think they were worried about, well, I don't want to speculate about their motives, but at any rate, the claim construction that they initially proposed or substituted changed the non-provisional range of C1 to C12 back to C2 to C12, NHCO C2 to C12. And then they either thought better of it or changed their minds for whatever reason. But the fact that they advocated that position is totally inconsistent with the notion that this would have been an apparent error to the reader that could only have meant NHCO C1 to C12 all along. What does the written description standard reasonably convey? It sounds like a little bit of a generous standard in terms of trying to figure out whether the written description does or does not disclose a particular claim. So I think this is one of those issues that, in this court's precedence, I don't know has a very clear definition. I think the idea is that the person of ordinary skill in the art reading the specification would recognize that the inventor was in possession of whatever is in question. And here, really, the undisputed inference from NHCO C2 to C12 is that they would be in possession only of, and it reasonably conveys possession only of that range, NHCO C2 to C12. The question then is, if you apply the written description standard, does it reasonably convey that this cannot have been deliberate? This cannot have been a range that they were indicating their possession of? But instead, does this convey that, well, really, when they said two, they must have meant one? And I submit that it doesn't, even if this court were to treat it as a factual question, and even if this court were to go look at all the things that Dr. Young says about the definition of alkyl and about the presence of other one-carbon moieties other than the one they need and that they sought to add in order to find improvement in this case. You can use up to four minutes of negative time for giving that. Thank you very much for that, Your Honor. Let me just see what other points that I need to hit that I haven't already. I do want to go back to this question of whether it's a legal question or a factual question, because I think the district court here has been faulted at some length. For what description is fact? Written description is fact, but error correction is not. And In re Oda, I think, is on all fours with this when it comes to what the, it was in a different posture than it was in the patent office in a reissue, but it was a new matter question. It was a question of whether the original application could be corrected so that the term nitrous acid that was in the original specification could be changed to nitric acid in the reissue specification. And the question there was, well, is that new matter? So it's new matter writ large, but what the Oda court did was it applied this obvious error standard. It treated that as a question of law. It said this is a question of law, even though compliance with the reissue statute has underlined fact, the underlying factual question of is this new matter? And then it went through and reversed the agency on this question. The agency had said, well, akin to the case here, they said nitrous, they meant nitric. The Oda court said, well, that can't be right. This is an obvious error on these facts because the specific gravity of nitrous is wrong. It has to be the specific gravity of nitric. The person who organized the ODA would have known that nitric is the only thing that would work in this context. And they performed de novo, after saying expressly it's a matter of question of law, they performed de novo an analysis of whether it was an obvious error. And the fight before the district court was, should we apply ODA or should we apply de novo? But on this question of, well, is this a factual written description question, the answer under either is no. It's a matter of correcting a public patent document to say something it didn't, which is something that is consistently treated as a question of law. And a question of law that, moreover, should not be allowed to expand the invention from what was disclosed to the public, what they chose to disclose to the public in their provisional application. I missed the way you characterized what has been consistently applied as a question of law. What is the characterization of the questions that are subject to that rule? The alteration, the retroactive deeming of a patent document to say something other than what it actually said is, I guess, perhaps the crispest formulation I can give, Your Honor. The changing the 2 to a 1, not because 2 would reasonably convey to the opposer that they also might have been able to use a 1, but because the 2 was actually an error and could not possibly have meant anything other than 1. Thank you, counsel. Thank you, Your Honor. Ms. Siecko can have four minutes to model, if you need it. Thank you, Your Honor. First, let me take on my co-counsel's characterization of ODA. So Judge Rich does say that the ultimate question is whether the patent office has the power to reissue, dependent upon whether there's new matter involved. It's a statutory authority question. However, he then goes on in the same paragraph to say that the actual analysis of new matter is a factual one, and it has to be done on a case-by-case basis. He's applying 112. I also want to address the question. Is this in the opinion? Apologies, Your Honor. You have a clean copy in front of me. Maybe 1357 to 1358? I'm looking. I guess the reference I have for ODA would be at page 1203 of the federal recorder at second. So then Judge Rich goes on then to take the testimony to hear the expert witness, the expert chemist, in support of the argument that there was a translation error and looks at the specification as a whole and performs the standard 112 written description analysis to assess whether the correction of the translational error added new matter or not. So it's the typical 112 written description analysis. This concept that ODA creates a high standard for obvious, I just want to make the point that Judge Rich isn't saying beyond a reasonable debate, which we see Mr. Krinsky kind of edging into over and over again. It's not useful to keep dropping the name of one particular judge who spoke for the court in an opinion. Thank you, Your Honor. So the second to the last paragraph of the ODA decision identifies that there can still be some confusion or perplexity over the change. In the decision, it reads, the mere fact that a change deprives a phrase of a needed antecedent so that the reader might be somewhat perplexed or confused doesn't mean that you conclude that there's been an injection of new matter. So obvious is clearly a different standard from beyond reasonable debate. Now, throughout the argument that was made by Pfizer, there's this underlying assumption that the change broadened the scope of the disclosure in some way. But Your Honor, that actually proves the point, that the question is, to a person of ordinary skill in the art, was the disclosure broadened or not? That's the written description question on the table. Now, Well, the written description is something there that isn't there. And whether that expands the scope of the disclosure or not. I want to direct the court's attention. We're not dealing with infringement, whether something is within the scope of a claim. We're talking about an obvious error. And if that's reduced to a written description question, the written description question reduces to whether something is there or not. Correct, Your Honor. Or it isn't in a provisional. So the number changed, but the disclosure did not. And ANTA presented expert testimony to that effect. I want to direct the court's attention to the Commonwealth Scientific case. I think that it's particularly relevant to the situation here. In that case, the patent applicant changed language in the specification and in the claim during prosecution from greater than 10 gigahertz to the phrase radio frequency. That happens repeatedly. And the inquiry before the court was, did that destroy the priority claim? Was that new matter? Or would a person of ordinary skill in the art reading the disclosure have understood that the disclosure captured radio frequencies as a whole? Which were recognized by the person of ordinary skill in the art as between 3 and 300 gigahertz. So I commend that case to the court's attention. Thank you. Thank you very much. You have exceeded your time. Thank you to both counsel. The case is submitted.